**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SOUDERTON AREA FOR ALL,** *et al.*, | : | **CIVIL ACTION** |
| | : | |
| Plaintiffs, | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 24-6202** |
| **SOUDERTON AREA SCHOOL** | : | |
| **DISTRICT,** | : | |
| | : | |
| Defendant. | : | |

**Perez, J.**                                                   **February 2, 2026**

### MEMORANDUM

Fundamental to the effective functioning of society is open discourse—the free exchange of ideas, perspectives, and opinions. Open discourse requires both speaking and listening, especially to those with whom we disagree. In this time when many communities feel divided, it is easy to get swept up in and frustrated by our differences. And it is hard to come together to resolve conflicts. But after a conflict, when cooler heads prevail, coming together can lead to creative solutions for the benefit of all involved.

In schools, we teach our children conflict resolution—how to actively listen to each other and to express themselves clearly and respectfully. We teach them it is important to right our wrongs. We teach them that our words matter and that when we make a promise, we should keep it. In our judicial system, we create opportunities for parties to litigation to engage in conflict resolution through settlement conferences or mediation. When litigants make promises to each other through these negotiations, we expect them to keep those promises, just like we teach our children. When one party keeps their promises, it would be unjust for the other to break theirs. Courts have the power to ensure such injustice does not occur.

This case did not start, however, with promises. It started with members of a community voicing their concerns to their elected officials, members of the Souderton Area School District (the "District"), and it came to this Court after the District retaliated by barring Plaintiffs from District property. Plaintiffs turned to this Court to vindicate their First Amendment rights, immediately seeking preliminary relief.

From the outset, the parties showed they were willing to work together to resolve their differences. They recognized that settlement would benefit everyone involved, including the community. They shared the goal of bringing the community together so the District can serve its purpose of ensuring their children receive a quality education, even if they disagree about the means to achieve that. At a settlement conference before this Court, the parties agreed that the District would, among other things, ensure better access to school board meetings, allow Plaintiffs on the property, and create a gathering area for peaceful demonstrations. The parties continued to work together to finalize their settlement agreement for close to six months. During that time, the District fulfilled nearly every promise it made in exchange for Plaintiffs' promise to settle the case. But when tensions again ran high, negotiations deteriorated, and after unsuccessfully trying to shift the goalposts, Plaintiffs sought to walk away.

The District now asks this Court to enforce the settlement agreement. Plaintiffs moved to strike the District's motion for violations of this Court's local rules. For the reasons discussed herein, the Court denies Plaintiffs' motion to strike and grants the District's motion to enforce. Although the Court finds there was no enforceable contract between the parties, equitable principles compel the Court to enforce the settlement agreement because the District fulfilled its promises in reasonable reliance on Plaintiffs' promises to settle if it did so, and it cannot now undo the work it has done.

## I.    Background of the Lawsuit

According to the Complaint, in August 2024, Plaintiffs and other District community members learned that then-member of the Board of School Directors of Souderton Area School District (the "Board") William Formica posted lewd comments on social media about Vice President Kamala Harris, disparaging teachers and non-English speakers, and deriding diversity programs.[1] In response, Plaintiff Souderton Area For All ("SAFA") encouraged its members to attend District Board meetings to protest and demand Mr. Formica's resignation.[2] The August 29, 2024 Board meeting saw high attendance of community members opposed to Mr. Formica's remarks, as well as a rally organized by SAFA to protest.[3] But the Board did not allow SAFA or its members to demonstrate on District property, requiring them to gather on a public sidewalk 80 feet away from where the meeting was held.[4] At the same time, the Board permitted supporters of Mr. Formica to gather and counter-protest directly outside the meeting's entrance on District property.[5] Due to increased attendance, the Board began requiring meeting attendees to provide photo-ID so that they could prioritize seating for District residents.[6] Several individual Plaintiffs were excluded from meetings as a result of this new rule.[7]

---

[1] Compl. at 1, ECF No. 1.

[2] *Id.*

[3] *Id.* at 6–7.

[4] *Id.* at 7.

[5] *Id.*

[6] *Id.* at 10.

[7] *Id.* at 10–11.

On September 26, 2024, as Board members exited a Board meeting, Plaintiffs Patrick Kitt, Christopher Spigel, and Helen Spigel protested by making cricket noises and accusing the Board of being complicit in Mr. Formica's misconduct through its silence.[8] One Board member was accompanied by her teenage daughter, who was upset and intimidated by the protesters directing questions and accusations to her.[9] Two weeks later, the District issued cease and desist letters to Plaintiffs Kitt, Spigel, and Spigel, informing them they could not be on school property for the remainder of the school year, including for public meetings.[10] On November 20, 2024, Plaintiffs filed this lawsuit, alleging the District's actions violated their rights to free speech and due process.[11] In addition to the Complaint, on November 20, 2024, Plaintiffs filed a Motion for a Temporary Restraining Order ("TRO"), seeking to enjoin the District from enforcing its ban on Plaintiffs from entering school property for the remainder of the 2024–25 school year and allowing Plaintiffs to enter school property to attend school board meetings and other events on the same terms as other members of the public.[12]

## II.    Settlement Negotiations

The Court held a status conference regarding the TRO on November 21, 2024.[13] There, both parties asked this Court to defer ruling on the TRO because they were working together to expediently resolve the issues so Plaintiffs could enter District property for the holiday concert

---

[8] *Id.* at 12.

[9] *See id.*

[10] *Id.* at 12–13.

[11] *See* ECF No. 1.

[12] ECF No. 5.

[13] ECF No. 13.

season and other school and District events.[14] The District did, in fact, allow Plaintiffs to enter school property for public Board meetings, and the parties agreed to defer any hearings or further briefing on the TRO until after mediation.[15]

Thereafter, the parties agreed to engage in settlement negotiations through a settlement conference facilitated by this Court on January 16, 2025.[16] There, the parties agreed to certain terms, including that (1) the School Board would livestream and archive School Board meetings; (2) the District would rescind the cease and desist letters that were sent to Plaintiffs Kitt, Spigel, and Spigel;[17] (3) the District would work with Franconia Township to designate an area for protests;[18] (4) the parties would issue a joint press release announcing the settlement; and (5) the District would pay Plaintiffs' attorneys fees, though the amount was not yet agreed upon.[19]

The District begin taking action in a show of good faith.[20] Driven by the belief that a settlement was nearly complete and that it was obligated to do so, the Board implemented the livestreaming and archiving of public Board meetings after voting to institute such a policy at its

---

[14] *See* Transcript of Nov. 21, 2024 Status Conference at 7:18–22 (District counsel stating they are working with the District to "tailor the cease and desist orders to limit the intrusion on them, and perhaps give them an opportunity to attend those [Board] meetings anyway"), 8:11–20 (District counsel indicating Plaintiffs would be permitted to attend student-related events), 9:19–23 (Plaintiffs' counsel indicating Plaintiffs would be amenable to continuing hearing on TRO as long as they are allowed on school property for non-school board meeting events).

[15] *See* Ltr. From B. Shore (Dec. 6, 2024), ECF No. 15 (asking for continuance of hearing on TRO because the parties "reached a temporary agreement regarding Plaintiffs . . . access to meetings of the District's Board of School Directors, rendering a hearing unnecessary at this time").

[16] Pls.' Resp. Def.'s Statement of Facts, ECF No. 54 at 2.

[17] ECF No. 54 at 3; *see also* Gallagher Decl. ¶¶ 3–5, ECF No. 39-2.

[18] ECF No. 54 at 3–4; *see also* ECF No. 39-1 at 11.

[19] ECF No. 54 at 5; Gallagher Decl. ¶ 6, ECF No. 39-2; Nelson Decl. ¶ 6, ECF No. 39-3.

[20] *See* ECF No. 54 at 5 ¶ 8; Gallagher Decl. ¶ 8, ECF No. 39-2.

February 2025 public meeting.[21] The District also formally rescinded the cease and desist letters.[22] The District created an area for protests alongside the District's Administrative Offices Building, where it holds public meetings,[23] though it did not discuss or share its plans with Plaintiffs before beginning the construction.[24] Plaintiffs did, however, provide feedback on the gathering area and requested that it be made accessible for individuals with disabilities.[25] The District agreed to do so.[26] While the gathering area has been partially constructed, construction is not complete.[27] The District has obtained estimates for the remaining work, which includes installation of a fence, and adding a curb cut to make the area accessible for individuals with disabilities.[28] To date, the District has spent $8,200,[29] and the estimate of the remaining construction exceeds $6,000.[30] The Board also authorized the issuance of $63,000 in attorneys' fees and costs to Plaintiffs' counsel in an executive session.[31]

---

[21] ECF No. 54 at 15; Transcript of Jan. 9, 2026 Hearing ("Jan. 9, 2026 Tr.") at 27:4–15, ECF No. 73.

[22] ECF No. 54 at 15.

[23] ECF No. 54 at 15. Plaintiffs dispute, however, that this "community gathering area" is consistent with the discussions at the January 16, 2025, settlement conference. *See* Jamison Decl. ¶¶ 4–6, 12.

[24] *See* Jamison Decl. ¶¶ 7–10, ECF No. 53-2.

[25] *See* Ex. C to Shore Decl., ECF No. 39-1 at 17 (Mar. 14, 2025 email from S. Rose to B. Shore); Jan. 9, 2026 Tr. at 75:13–76:4, ECF No. 73 (Gallagher testimony); Jan. 15 Tr. at 51:23–52:21, ECF No. 74 (Jamison testimony).

[26] *See* Jan. 9, 2026 Tr. at 75:13–76:4, ECF No. 73 (Gallagher testimony); Jan. 15 Tr. at 51:23–52:21, ECF No. 74 (Jamison testimony); Shore Decl. ¶ 11, ECF No. 39-1.

[27] *See* Jan. 9, 2026 Tr. at 60:3–15, ECF No. 73 (noting that the District paused work on the gathering area "until we know we have a settlement agreement").

[28] Jan. 9, 2026 Tr. at 57:22–60:15, 75:13–76:4, ECF No. 73 (stating that "if this becomes an agreed agreement," the handicap accessible ramp will be constructed).

[29] Gallagher Decl. ¶ 19, ECF No. 39-2.

[30] Jan. 9, 2026 Hearing Ex. 4 (Invoices and Estimate for Community Gathering Area).

[31] ECF No. 54 at 16.

Meanwhile, through counsel, the parties continued to negotiate the details of the settlement agreement and exchanged several drafts between March and April 2025.[32] One of the settlement terms provided: "The Parties have agreed to the press release, attached hereto as Attachment 'A' to be issued from the ACLU of Pennsylvania regarding the resolution of the Civil Action."[33] To effectuate that term, on March 31, 2025, Plaintiffs' counsel provided a draft press release to the District for its approval.[34]

On April 21, 2025, Plaintiffs "signed off on the settlement agreement," which included the joint press release provision.[35] Plaintiffs also asked if the Board would vote on the settlement agreement at the Board meeting scheduled for April 22.[36] The District explained that the Board would not vote on the agreement until the May meeting because it first needed to discuss the draft press release in an executive session.[37] The Board could not agree on the language of the press release, so on April 28, 2025, the District informed Plaintiffs that it would prefer for neither party to issue a press release and sent draft language to that effect to include in the agreement.[38] On May 1, 2025, Plaintiffs rejected that term but stated they would agree to remove the press release

---

[32] ECF No. 54 at 7; Ex. H to Shore Decl., ECF No. 39-1 at 40–41.

[33] Ex. J-1 to Shore Decl., ECF No. 39-1 at 50.

[34] Ex. H to Shore Decl., ECF No. 39-1 at 40–41.

[35] Ex. I to Shore Decl., ECF No. 39-1 at 44.

[36] Ex. I to Shore Decl., ECF No. 39-1 at 44.

[37] Ex. I to Shore Decl., ECF No. 39-1 at 43.

[38] Ex. J-2 to Shore Decl., ECF No. 39-1 at 54.

provision from the settlement agreement altogether so that either side could issue their own statement.[39]

Throughout this time, Plaintiff Maureen Kratz both publicly and privately continued to air her grievances with the Board with respect to the events at the August 29, 2024 Board meeting and with respect to the District's handling of this lawsuit.[40] For example, on February 18, 2025, six days after the Board voted to approve the livestreaming policy, she emailed then-Board president Stephen Nelson, accusing Board member Kim Wheeler and the district of being petty in the litigation process.[41] Specifically, she accused them of squandering money by asking for settlement terms to which Plaintiffs, including Ms. Kratz, had already agreed.[42] On April 25, 2025, four days after "sign[ing] off on the settlement agreement," Ms. Kratz emailed Board member Wheeler, copying all the Board members, attaching a video of the interaction outside the August 29, 2024 Board meeting, asking her to resign, "not just for your blatant lies, but for the legal mess and mounting costs from the ACLU lawsuit [Ms. Wheeler] helped cause."[43] On April 26, 2025, nearly eight months after the incident, Ms. Kratz posted the video on her Right To Know Souderton Facebook page with the caption "How does a mother include her young daughter in a lie? If this had gone to court, would she have had her child lie?"[44] Notwithstanding Ms. Kratz's repeated complaints of the underlying events leading up to this lawsuit and of the District's "squandering"

---

[39] ECF No. 54 at 13.

[40] *See, e.g.*, Exs. C, F, H, and I to Nelson Decl., 39-3 at 18, 38, 49, 51.

[41] Ex. C to Nelson Decl., ECF No. 39-3 at 18.

[42] Ex. C to Nelson Decl., ECF No. 39-3 at 18.

[43] Ex. H to Nelson Decl., ECF No. 39-3 at 49.

[44] Ex. I to Nelson Decl., ECF No. 39-3 at 51.

money on its representation,[45] the parties continued to work toward finalizing the agreement. Until May 1.

On May 1, 2025, the District learned Ms. Kratz had filed a "Report of Criminal Activity" with the Montgomery County District Attorney's Office, asking it to initiate an investigation into the issuance of the cease-and-desist letters eight months earlier.[46] The District's counsel expressed concerns that this criminal report could imperil the settlement.[47] And indeed, this was the catalyst for the breakdown in negotiations between the parties.[48]

In response to the District's concerns about how Ms. Kratz's complaint might impact the settlement, Ms. Kratz agreed to voluntarily dismiss her claims in this case with prejudice.[49] The District rejected this offer, and on May 10, 2025, it filed an Answer to the Complaint[50] and informed Plaintiffs' counsel that the Answer "does not mean that the District is uninterested in continuing to see if [the Parties] can resolve this matter amicably."[51]

---

[45] The Court notes that Ms. Kratz's posts and emails were not sanctioned by her fellow Plaintiffs. *See* Jan. 9, 2025 Tr. at 60:10–21, ECF No. 73 (S. Jamison Testimony) ("They were not in the spirit of Souderton For All.")

[46] Shore Decl., ECF No. 39-1 ¶ 24; Ex. M to Shore Decl., ECF No. 39-1 at 74; *see also* Ex. 4 to Pls.' Opp. Mot. Enforce, ECF No. 53-4.

[47] Shore Decl. ¶ 27, ECF No. 39-1.

[48] The Court recognizes that Ms. Kratz has the right to post what she chooses on her Facebook page. The Court provides this background only to show the effect of Ms. Kratz's conduct on the finalization of the settlement negotiations. During the settlement conference, the parties worked together with this Court in the spirit of moving forward with a settlement for the collective good of all of Souderton Area School District. The District continued moving forward in that spirit consistent with its promises. Ms. Kratz, however, chose to escalate tensions by filing a criminal report based on an incident nearly eight months after it occurred, almost three months after the cease-and-desist letters were formally rescinded, and six days after Plaintiffs had signed off on the settlement terms.

[49] Ex. M to Shore Decl., ECF No. 39-1 at 86.

[50] *See* ECF No. 23.

[51] Ex. M to Shore Decl., ECF No. 39-1 at 82, 84; *see also* Ans., ECF No. 23.

On May 12, 2025, the District's counsel wrote to the Court requesting its intervention in the settlement negotiations and stating that: "At the very least, the District desires a statement in the settlement agreement indicating that none of the Plaintiffs will bring a private criminal complaint or recommend that any other entity or agency bring a criminal action against the District, its Board members, administrators, staff, or representatives as a result of the underlying allegations in this lawsuit."[52] On May 13, Plaintiffs made several offers of settlement that materially altered the terms, including increased attorneys' fees because of the additional work that had been done in connection with the devolving settlement negotiations.[53] Plaintiffs also rejected any provision that would prevent them from filing criminal complaints or cooperating in criminal investigations.[54]

In response the same day, the District's counsel stated that she did not expect the District would renegotiate the attorneys' fees and that Ms. Kratz's filing of a report of criminal activity "was akin to dropping a bomb on the settlement."[55] On or around May 15, Plaintiffs' counsel indicated that she "did not believe settlement was still on the table for [her] clients because they had changed their minds" about one of the terms of the agreement.[56]

On May 27, the parties had a status conference with the Court, wherein the District's counsel indicated it was willing to move forward with the settlement.[57] They stated that the District

---

[52] Ex. M to Shore Decl., ECF No. 39-1 at 71; Ex. 5 to Pls.' Br. Opp., ECF No. 53-5 at 8.

[53] Ex. M to Shore Decl., ECF No. 39-1 at 83.

[54] Ex. M to Shore Decl., ECF No. 39-1 at 83.

[55] Ex. M to Shore Decl., ECF No. 39-1 at 82.

[56] Ex. M to Shore Decl., ECF No. 39-1 at 74.

[57] Transcript of May 27, 2025, Status Conference ("May 27, 2025 Status Tr.") at 11:11–15, 12:3–8, Jan. 9, 2026 Hearing Ex. 12.

had gone so far as to "have a written settlement agreement that has been blessed by the plaintiffs, even . . . leaving the press release issue . . . silent in the agreement."[58] The District's counsel further represented that "[w]e believe, as counsel, and that was represented to us by the Board President, that we will have five – at least five affirmative votes for the settlement as originally contemplated in the draft agreement that we have there, sans reference to a press release."[59]

On May 30, 2025, Plaintiffs sent a letter clarifying that as of April 24, 2025, "the date the Board rejected Plaintiffs' last offer by refusing to vote on it," Plaintiffs had no outstanding offer of settlement.[60] The School Board did not ultimately cast a public vote to approve the settlement agreement.

## III.    Relevant Procedural History

On June 16, 2025, the District filed a motion to enforce the settlement with a brief and exhibits filed under seal pursuant to this Court's order that the terms discussed in the settlement conference be kept confidential.[61] On June 26, 2025, Plaintiffs moved to strike the District's motion to enforce the settlement and a motion for an enlargement of time to respond to the District's motion to enforce.[62] The Court did not immediately grant or deny Plaintiffs' motion for additional time, and Plaintiffs filed a response to the District's statement of facts and a brief in opposition to the motion to enforce on November 19, 2025.[63] Both motions have been fully briefed.

---

[58] May 27, 2025 Status Tr. at 11:11–15, 12:3–8.

[59] May 27, 2025 Status Tr. at 13:1–6.

[60] Ex. N to Shore Decl., ECF No. 39-1 at 97.

[61] Mot. Enforce, ECF No. 37; Br. Supp. Mot. Enforce, ECF No. 39.

[62] Mot. Strike, ECF No. 43; Mot. Ext. Time, ECF No. 44.

[63] Pls.' Resp. Statement of Facts, ECF No. 54; Pls.' Br. Opp. Mot. Enforce, ECF No. 53.

The Court held a bifurcated evidentiary hearing on the motion to enforce the settlement on January 9 and January 15, 2026.

## IV.    Motion to Strike

Plaintiffs move to strike the District's Motion to Enforce Settlement because (1) the District cited and attached dispute resolution communications in violation of Local Civil Rule 53.3(c); and (2) the District failed to submit a statement of facts in support of the motion to enforce.[64] With respect to the dispute resolution communications, Plaintiffs ask the Court only to strike the references to the communications that occurred at and in connection with the settlement conference. With respect to the failure to submit a statement of facts, Plaintiffs ask the Court to strike the motion to enforce in its entirety.

While motions to strike are generally brought under Rule 12(f) of the Federal Rules of Civil Procedure, Rule 12(f) applies to pleadings, not briefs. *Boscov's Dep't Store, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 546 F. Supp. 3d 354, 361 (E.D. Pa. 2021); *see also* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). Nonetheless, under federal district courts' "inherent power to manage cases that come before them," they may consider "motions that a party captions a motion to strike but that are different in kind than the motions that Rule 12(f) contemplates." *Boscov's Dep't Store*, 546 F. Supp. 3d at 361 (first quoting *Williams v. Guard Bryant Fields*, 535 F. App'x 205, 212 (3d Cir. 2013); and then quoting *McGinnis v. Midland Funding LLC*, No. 2:20-cv-05370, 2021 WL 1061198, at *1 (E.D. Pa. Mar. 19, 2021)).

---

[64] ECF No. 43 at 2.

District courts have "'considerable discretion in disposing of a motion to strike under Rule 12(f),' but such motions are 'not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" *Bobrick Washroom Equip., Inc. v. Scranton Prods., Inc.*, No. 14-CV-853, 2020 WL 975476, at *3 (M.D. Pa. Feb. 28, 2020) (quoting *Krisa v. Equitable Life Assur. Soc.*, 109 F. Supp. 2d 316, 319 (M.D. Pa. 2000)) (granting motion to strike paragraphs disclosing settlement discussions because such material was immaterial and impertinent to the matters at issue). Plaintiffs have demonstrated no prejudice here and there is no confusion of issues related to the disclosure of communications from the settlement conference, so the motion to strike is denied.

### A. Dispute Resolution Communications

Local Civil Rule 53.3 establishes alternative dispute resolution ("ADR") processes for civil actions, including settlement conferences before the judge to whom the case is assigned. Rule 53.3(c) requires the parties to keep confidential "[a]ll ADR processes subject to this Rule" and prohibits "disclosure or use by any person of dispute resolution communications . . . unless confidentiality has been waived by all participants in the ADR process, or disclosure is ordered by the assigned judge for good cause shown." A confidentiality rule like Rule 53.3(c) serves an important purpose: it "permits and encourages counsel to discuss matters in an uninhibited fashion often leading to settlement." *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 435 (3d Cir. 2005) (citation omitted). Nonetheless, courts may enforce settlement agreements based on communications that occur in settlement conferences. *See, e.g.*, *Shelley v. Somerset Cnty. Jail*, 581 F. App'x 126, 128 (3d Cir. 2014) (non-precedential) (affirming order enforcing oral settlement agreement negotiated at settlement conferences before magistrate with details later finalized

between the parties); *Camargo v. Alick Smith Gen. Contractor, Inc.*, No. 5:15-cv-06215, 2016 WL 6568120, at *2–3 (E.D. Pa. Nov. 4, 2016) (enforcing oral agreement reached at settlement conference based on terms placed on the record at its conclusion); *McClure v. Twp. of Exeter*, No. 05-5846, 2006 WL 2794173, at *2 (E.D. Pa. Sept. 27, 2006) (enforcing settlement agreement negotiated at settlement conference before magistrate).

Here, Plaintiffs specifically request that the Court strike portions of the District's brief and corresponding declarations, which "use and disclose the parties' alleged 'bottom lines' that were shared with the Court during the settlement conference, the parties' alleged positions regarding same, and an alleged request by the Court as support for the District's Motion."[65] Plaintiffs point to the Third Circuit's pronouncement that "[i]f counsel know beforehand that the proceedings may be laid bare on the claim that an oral settlement occurred at the conference, they will of necessity feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute.'" *Beazer E.,* 412 F.3d at 435 (cleaned up). This is true and an important consideration here. But *Beazer E.* is distinguishable. It involved the local appellate rule, which not only prohibits parties from using "any information obtained as a result of the [appellate] mediation process as a basis for any motion or argument to any court," 3d Cir. L.A.R. 33.5(c), but also requires all settlement agreements to be reduced to writing before they may be enforced, 3d Cir. L.A.R. 33.5(d). The District Court's Local Civil Rule does not require a written agreement to bind the parties. *See* L. Civ. R. 53.3. Additionally, *Beazer E.* involved the details of settlement negotiations of which the panel was not already aware. 412 F.3d at 433–34. The court noted

---

[65] ECF No. 43-1 at 2.

concerns that requiring an appellate court to enforce an agreement reached at a confidential settlement conference would require it "to receive evidence and resolve factual disputes, tasks more properly suited to the district courts," and that parties could bring motions to enforce settlement as "a strategy to pierce the confidentiality of the negotiations and inform the judges of the parties' position, rather than to carry out an agreement actually reached." *Id.* at 435 (citation omitted). These are not concerns here. The District is not seeking "to pierce the confidentiality of the negotiations and inform the [Court] of the parties' positions." *Id.* This Court facilitated the settlement conference and is already aware of the parties' positions as they were presented at the time, and the District is seeking to enforce an agreement it believes the parties actually reached.

Moreover, Plaintiffs have not demonstrated prejudice beyond a bald assertion that allowing a party to rely on confidential settlement communications to enforce a settlement agreement allegedly reached through those communications would negatively affect the ADR process. Their argument ignores two things: (1) this Court facilitated the settlement conference, and (2) the District is not seeking to enforce the terms of the agreement as they were understood at the settlement conference. Rather it has moved to enforce terms that were agreed upon through communications between counsel over the next several months. The District's references to the communications that occurred at the settlement conference provide context to the progression and then ultimate breakdown of negotiations, but that does not prejudice Plaintiffs or confuse the issues. That is especially so when, even if stricken, the Court already knew that context.

Confidentiality of settlement negotiations is important to allow the parties to negotiate openly and in good faith without fear of their communications harming their case should negotiations fail. But it is equally important that parties who leave settlement negotiations can trust that agreements reached in good faith can be enforced. And indeed, courts frequently enforce oral

agreements that parties reach in settlement conferences, even if not finalized in writing. To allow Plaintiffs to use Local Civil Rule 53.3(c) as a shield to avoid being held to an agreement reached months after the settlement conference would undermine the Court's goal of encouraging cooperation to reach a just resolution for all parties.

### B.  Statement of Facts

Plaintiffs next contend the Motion to Enforce should be stricken in its entirety for failure to comply with this Court's Policies and Procedures. This Court requires motions for summary judgment to be accompanied by a statement of facts jointly prepared by the parties and separately filed on the docket. Plaintiffs argue that because courts treat motions to enforce settlement under the same standard as motions for summary judgment, the same policies and procedures should apply as well.

While it is true that the Court must determine the parties' positions on the factual assertions by each side to determine whether there are any disputed issues of material fact as to the settlement agreement's validity, it does not necessarily follow that the Court's Policies and Procedures pertaining to summary judgment motions must apply to motions to enforce settlements. Additionally, the Court requires the party seeking summary judgment to serve a first draft of undisputed facts on the non-movant at least 28 days before the filing deadline so the parties can prepare a joint statement of facts. But on May 30, 2025, the Court set a deadline of June 16 for the filing of any motion regarding settlement enforcement.[66] This 17-day period would not allow the parties to engage in the back-and-forth process the Court requires for summary judgment motions.

---

[66] ECF No. 35.

It would not make sense to penalize the District for not adhering to a policy with which it could not have complied.

Additionally, once again, Plaintiffs have not been prejudiced by the District's failure to submit a numbered statement of facts. Plaintiffs were able to respond to the District's statement of facts and did so on November 19, 2025.[67] The District has argued that the Court should decline to consider Plaintiffs' brief and contestation of the facts because Plaintiffs did not respond within the fourteen days required by the local rules of this Court.[68] The Court, however, recognizes that Plaintiffs sought an extension of time when they filed their motion to strike.[69] The Court granted that motion on December 22, 2025, after Plaintiffs had responded and before scheduling the hearing on the motion to enforce.[70] The Court has thoroughly and thoughtfully considered Plaintiffs' presentation of facts and their arguments in opposition to the District's motion to enforce, thereby curing any possible prejudice.

Finally, the Third Circuit has repeatedly expressed its preference to decide matters on the merits, rather than dismissing for procedural technicalities. *See Rodriguez v. City of Phila.*, No. 14-7362, 2015 WL 4461785, at *7 (E.D. Pa. July 21, 2015) (citing *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984)). Accordingly, the Court will decide the merits of the District's motion to enforce, rather than strike it for any perceived procedural violations.

---

[67] ECF No. 54.

[68] ECF No. 55 at 2.

[69] ECF No. 44.

[70] Order Mot. Ext. Time, ECF No. 57.

## V.    Motion to Enforce the Settlement

A motion to enforce a settlement agreement is analyzed under the summary judgment standard of review. *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991). Accordingly, the Court must "treat all the non-movant's assertions as true, and 'when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.'" *Id.* at 1032 (quoting *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)). "Where material facts concerning the *existence or terms* of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Saudi Basic Inds. Corp. v. Exxon Corp.*, 364 F.3d 106, 113 (3d Cir. 2004).

In determining the enforceability of a settlement agreement, state law contract principles govern. *See Tiernan*, 923 F.2d at 1032–33. Pennsylvania law provides:

> To be enforceable, a settlement agreement must possess all of the elements of a valid contract. As with any contract, it is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement. Where the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement.

*Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999) (cleaned up). The analysis requires two determinations: (1) "whether both parties have manifested an intention to be bound" by the terms of the settlement agreement; and (2) "whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986).

## A.  The Board Did Not Manifest an Intent To Be Bound.

In determining whether a party has manifested an intent to be bound, "the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d

575, 582 (3d Cir. 2009). While "evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract," parties may manifest an intention to be bound while also manifesting an intention to formalize the agreement in writing. *Id.* But under Pennsylvania law, a school district generally cannot manifest an intent to be bound without publicly voting to approve a contract. *See* 24 P.S. § 5-508.

### 1.  A Public Vote Is Required to Manifest the District's Intent To Be Bound.

The parties disagree as to whether the District could have manifested an intent to be bound without the Board's formal vote to approve the settlement agreement. The District argues that it has established it intended to be bound by fulfilling a majority of the negotiated terms, including voting to livestream and archive recordings of Board meetings, rescinding the cease and desist letters, constructing an area for protests, and approving an amount of attorneys' fees to be paid by its insurance provider. Plaintiffs, however, argue the Board could not manifest an intent to be bound without a formal, public vote to approve the agreement. The Court agrees with Plaintiffs.

Under the Pennsylvania Public School Code, "[t]he affirmative vote of a majority of all the members of the board of school directors in every school district, duly recorded, showing how each member voted" is required when the Board "enter[s] into contracts of any kind . . . where the amount involved exceeds one hundred dollars ($100)." 24 P.S. § 5-508. "Failure to comply with the provisions of this section shall render such acts of the board of school directors void and unenforceable." *Id.* This mandate applies to settlement agreements exceeding $100. *Sch. Dist. of Phila. v. Framlau Corp.*, 328 A.2d 866, 870 (Pa. Commw. Ct. 1974).

As an initial matter, the District's obligations under the terms of this settlement agreement exceed $100. For example, the additional construction of the gathering area, which the District agreed to complete, is estimated to cost far more than $100.[71] Therefore, § 5-508 applies.

Under § 5-508, until the Board publicly votes to approve a settlement agreement, an agreement cannot be enforced. *Framlau Corp.*, 328 A.2d at 870. "No single member of the board is the board itself." *Id.* Therefore, representations by a single Board member or the Board's attorney that the Board agrees to the terms does not replace Board action. *Id.* This is true, even where the Board has agreed in an executive session to approve an agreement at the next public meeting. *Id.* at 868–69 (noting that the Board agreed in executive session to approve the settlement agreement at the next meeting but deferred the matter and did not vote), 871 ("The board cannot by inaction do what the Code requires action to accomplish.").

Furthermore, all individuals negotiating settlement terms with a school board are on notice that contracts over $100 must be approved in a public vote and that either party may walk away until that occurs. *Berkheimer Assocs. ex rel. N. Coventry Twp. v. Norco Motors*, 842 A.2d 966, 970 (Pa. Commw. Ct. 2004). So, "[p]ersons relying on agreements with an agent of the school district without first obtaining approval by a vote of the majority of the members at a public meeting do so at their peril." *Id.* at 971. This principle works both ways—a school board acts at its peril when it takes action to comply with the terms of a settlement agreement that it has not yet formally approved. *Atanasoff v. Lower Dauphin Sch. Dist.*, No. 1:05-CV-0513, 2006 WL 8451079, at *3 (M.D. Pa. Feb. 14, 2006) (citing *Framlau*, 328 A.2d at 870) ("[B]oth parties, not plaintiffs alone, enter into settlement agreements that are contingent upon school board approval at their 'own

---

[71] Jan. 9, 2026 Hearing, Defense Ex. 4 (Invoices and Estimate for Community Gathering Area).

peril.'"); *see also Morris v. Sch. Dist. of Phila.*, No. 86-1189, 1988 WL 82861, at *1 (E.D. Pa. Aug. 4, 1988). The Board cannot now enforce a settlement agreement which Plaintiffs would have no mechanism to enforce under traditional contract principles.

### 2.   No Exception to the Public Vote Requirement Applies.

The Board argues that Stephen Nelson, Board President until December 2025, was authorized to speak on behalf of the Board and relay approval of the settlement terms.[72] Where there is no public vote but there is "solid proof" that the Board has approved an agreement, an agreement may be enforceable. *Cadchost, Inc. v. Mid Valley Sch. Dist.*, 512 A.2d 1343, 1345 (Pa. Commw. Ct. 1986); *see also Mullen v. DuBois Area Sch. Dist.*, 259 A.2d 877, 880 (1969) (establishing an exception to formal vote requirement where there is solid proof from which Board approval may be inferred). For example, in *Cadchost*, the court found that the solicitor's testimony that at least seven of nine board members at a work session authorized him to negotiate the sale of land and close for a specific price was "solid proof" that a majority of board members authorized him to bind the Board in contract. *Id.* at 1345. In *Mullen*, solid proof was found to establish an employment contract where the school board acquiesced to a teacher's appointment for over a year and the board publicly recognized his receipt of a favorable commendation at a public meeting. 259 A.2d at 880.

Here, the District did not present solid proof that the Board authorized anyone to enter an agreement on its behalf or that it approved the final settlement agreement. Mr. Nelson's Declaration contains no averment that the full Board voted to authorize him to enter an agreement on the Board's behalf. In fact, Mr. Nelson's declaration casts doubt on any argument that he had

---

[72] ECF No. 55 at 6.

authority to unilaterally bind the Board. Mr. Nelson himself stated that "[b]ecause [he] wanted the Board's feedback on the joint press release, [he] did not feel comfortable having the Settlement Agreement be voted on at the April 24, 2025 meeting, and it was not added to the agenda for that meeting."[73] There is also not solid proof that the District's counsel had authority to act on the Board's behalf. The settlement negotiations were primarily conducted by email and telephone between counsel for the parties. With each suggested change to the agreement, counsel for the parties sought their clients' approval before expressing agreement.[74]

In his testimony at the hearing, current Board President Ken Keith also did not provide solid proof that the Board had authorized Mr. Nelson or the District's counsel to act on the Board's behalf.[75] Mr. Keith indicated that the only authority given to counsel to negotiate came from the Board president, not the Board as a whole.[76] And indeed, at each step of the way, both sought approval from the Board before agreeing to the terms. Absent solid proof, the District has not manifested an intent to be bound.

### B. There Is No Enforceable Contract.

Even if the District had manifested an intent to be bound without a public vote, the Court finds that no contract was formed. It is axiomatic that a contract requires an offer and acceptance. *Cawthorne v. Erie Ins. Grp.*, 782 A.2d 1037, 1038 (Pa. Super. Ct. 2001) ("Basic contract law

---

[73] Nelson Decl. ¶ 22, ECF No. 39-3.

[74] *See, e.g.*, Shore Decl. Ex. I, ECF No. 39-1 at 43 (defense counsel indicating the District needed to discuss press release provision); Shore Decl. Ex. E (plaintiffs' counsel indicating she needs to run draft agreement by clients).

[75] *See* Jan. 9, 2026 Tr. at 47:10–23, ECF No. 73.

[76] Jan. 9, 2026 Tr. at 47:10–23, ECF No. 73 ("Q: Did the board authorize anyone else to give that final approval? A: . . . . We were working with our attorneys, Ms. Shore and their firm. The authorization, if you will, was through the board President being a part of it and our attorneys. The board saying yes to the settlement, again, if I'm hearing you correctly, is I believe we authorized the settlement by saying we can move forward with this. We did not do that publicly out front, but we agreed to the terms. And that's why we started doing some of the things we were asked to do.").

directs that in order to constitute a contract there must be an offer on one side and an acceptance on the other."). If, in response to an offer, the offeree suggests a change to the terms, that operates as a counter-offer. *Hedden v. Lupinsky*, 176 A.2d 406, 408 (Pa. 1962) ("To constitute a contract, the acceptance of the offer must be absolute and identical with the terms of the offer."). A counter-offer terminates an offeree's power to accept an offer. *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 518 (Pa. Super. Ct. 2009); Restatement (Second) of Contracts § 36 (1981). Additionally, a subsequent offer that alters the terms but involves the same subject matter terminates the offeree's power to accept the original offer. *L. Offs. of Bruce J. Chasan, LLC v. Pierce Bainbridge Beck Price & Hecht, LLP*, 792 F. App'x 195, 200 (3d Cir. 2019) (non-precedential) (quoting 1 Timothy Murray, Corbin on Contracts § 2.20 (2019); *Keim v. Richland Twp. Bd. of Supervisors*, No. 3:2006-95, 2007 WL 1005969, at *2 (W.D. Pa. Mar. 30, 2007) (quoting 1-2 Corbin on Contracts, § 2.20 (2006)).

The District seeks to enforce a version of the settlement agreement that Plaintiffs "signed off on" on April 21, 2025, but without the provision requiring the parties to issue a joint press release.[77] Plaintiffs' April 21 email was an offer. The District rejected that offer and replied with a counter-offer with a materially different term: "The Parties agree that neither Party will issue a press release regarding the resolution of the Civil Action."[78] Plaintiffs did not agree to this term and, instead, on May 1, they suggested that the parties could "take the press release provision out

---

[77] *See* Shore Decl. Ex. I, ECF No. 39-1 at 44 (April 21, 2025, email from Plaintiffs' counsel stating Plaintiffs "signed off on the settlement agreement"); Shore Decl. Ex. J, ECF No. 39-1 at 47–52 (agreement Plaintiffs "signed off on" on April 21, 2025); Nelson Decl. Ex. L, ECF No. 39-3 at 60–65 (agreement with no press release provision).

[78] Shore Decl. Ex. J, ECF No. 39-1 at 55.

of the settlement agreement altogether and allow each side to issue its own press release."[79] That was another new offer, after which the negotiations began to devolve.[80]

On May 12, the District requested an additional term in the settlement agreement that would prevent Plaintiffs from "bring[ing] a private criminal complaint or recommend[ing] that any other entity or agency bring a criminal action against the District, its Board members, administrators, staff, or representatives as a result of the underlying allegations in this lawsuit."[81] The request for an additional term was a rejection of Plaintiffs' May 1 email.

On May 13, Plaintiffs sought a change to the amount of attorneys' fees and costs.[82] The District's counsel did not expect the District would be willing to agree to that counter-offer.[83] On or around May 15, Plaintiffs' counsel indicated that she "did not believe settlement was still on the table for [her] clients because they had changed their minds" about one of the terms of the agreement.[84]

On May 27, the parties had a status conference with the Court, wherein the District's counsel indicated it was willing to move forward with Plaintiffs' offer from May 1, 2025, with five Board members willing to vote in favor.[85] The District argues that this was an acceptance of

---

[79] Shore Decl. Ex. K, ECF No. 39-1 at 59.

[80] *See* Jan. 9, 2026 Tr. at 127:17–128:25 (M. Kratz Testimony); ECF No. 53-4.

[81] ECF No. 53-5 at 8.

[82] ECF No. 39-1 at 83.

[83] ECF No. 39-1 at 82.

[84] ECF No. 39-1 at 74.

[85] May 27, 2025, Status Tr. at 11:11–15, 12:3–8, 13:1–6 (stating that the District had gone so far as to "have a written settlement agreement that has been blessed by the plaintiffs, even . . . leaving the press release issue . . . silent in the agreement").

Plaintiffs' May 1 offer to enter an agreement that would be silent as to the issuance of a press release. But it is clear that between Plaintiffs' May 1 offer and the District's May 27 purported acceptance, multiple communications by both parties proposed additional or altered terms to the agreement as it would have been on May 1. Each of those offers and counter-offers terminated the District's ability to accept any preceding offer. *See L. Offs. of Bruce J. Chasan*, 792 F. App'x at 200. Accordingly, there is no settlement agreement that this Court can enforce under traditional contract principles. *ATACS Corp. v. Trans World Comms., Inc.*, 155 F.3d 659, 667 (3d Cir. 1998) (explaining that absent agreement on essential terms, "there is nothing for the court to enforce.").

### C. Promissory Estoppel

Even where no enforceable settlement contract exists, Pennsylvania law recognizes promissory estoppel as an equitable basis to enforce settlement promises when reliance and injustice are shown. *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). To prevail, the proponent must establish: "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Id.*; *I.K. ex rel. B.K. v. Sch. Dist. of Haverford Twp.*, 961 F. Supp. 2d 674, 694 (E.D. Pa. 2013), *aff'd* 567 F. App'x 135 (3d Cir. 2014). Promissory estoppel is an equitable doctrine, and the third element—whether enforcement is necessary to avoid injustice— is "fact-intensive" and depends on the reasonableness and substantiality of the reliance. *I.K.*, 961 F. Supp. 2d at 694 (quoting *Thatcher's Drug Store of W. Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 636 A.2d 156, 160 (Pa. 1994)).

## 1. Plaintiffs Made Promises They Should Have Reasonably Expected to Induce District Action.

The record supports a finding that Plaintiffs, through counsel and through their course of dealing, made promises conveying that the dispute had been resolved in principle and that settlement implementation should proceed. At the Court-facilitated settlement conference, the parties reached agreement on the core components of resolution, including rescission of cease-and-desist letters, livestreaming and archiving of Board meetings, designation of a protest/gathering area, and payment of attorneys' fees, with the remaining work focused on formalizing those terms in writing. Counsel thereafter exchanged drafts and status reports reflecting continued progress toward finalization.[86] Throughout the continued negotiations, Plaintiffs were aware the Board was taking action on its promises, with the understanding that Plaintiffs would sign the settlement agreement.[87] Plaintiffs did not waiver from their initial promises until after the District had performed its obligations, and in fact, agreed that the District had taken action consistent with the settlement agreement as they understood it.[88] And Plaintiffs did not object to the District's continued performance of its obligations, except to request certain changes be made to ensure the protest area was made accessible to people with disabilities.[89] This

---

[86] *See, e.g.*, Ex. G to Shore Decl., ECF No. 39-1 at 37 (status report to Court indicating Parties had draft settlement agreement that they were working toward finalizing); ECF No. 54 at 7; Ex. H to Shore Decl., ECF No. 39-1 at 40–41.

[87] *See* Pls.' Resp. Def.'s Statement of Facts at 5 ¶ 8, ECF No. 54.

[88] Jan. 9, 2026 Tr. at 96:6–24, 104:15–105:9 (M. Kratz acknowledging the District moved forward with livestreaming, one component of Plaintiffs' settlement demands, one month after settlement conference), 110:13–111:9 (M. Kratz acknowledging rescission of cease and desist letters was performance of District's obligation under settlement agreement), ECF No. 73; Jan. 15, 2026 Tr. at 10:15–24 (S. Jamison agreeing that District satisfied condition of settlement relating to rescission of cease and desist letters), 12:2–10 (S. Jamison agreeing that District satisfied livestreaming condition of settlement),12:18–23 (S. Jamison acknowledging that District agreed to pay attorneys' fees), Transcript of Jan. 15, 2026 Hearing ("Jan. 15, 2026 Tr.") at 9:24–10:10 (S. Jamison explaining expressed concerns about demonstration area being larger and handicap accessible and acknowledging that District agreed to make it accessible), ECF No. 74.

[89] *See* Jan. 9, 2026 Tr. at 116:20–117:8, ECF No. 73 (M. Kratz indicating that although Plaintiffs had concerns about the demonstration area, Plaintiffs "made some concessions regarding that particular area in order to keep this moving

is clear from Plaintiffs' April 21, 2025 email, which was sent after the District had completed a substantial amount of its obligations, wherein Plaintiffs' counsel represented that Plaintiffs had "signed off" on the settlement agreement and inquired about the timing of Board action.[90] Plaintiffs continued to represent they intended to settle the case until the beginning of May 2025.[91]

Pennsylvania law does not require a fully executed contract to establish a promise for purposes of estoppel; rather, the court considers whether the promisor's "words and deeds" objectively communicated an assurance on which reliance was foreseeable. *I.K.*, 961 F. Supp. 2d at 696, 700; *see also Crouse*, 745 A.2d at 610. Taken in context, Plaintiffs' representations went beyond preliminary negotiation and reasonably conveyed that the matter had been resolved in substance, such that the District should proceed with implementation.

### 2. The District Took Definite and Substantial Action in Reliance.

The District's reliance was neither speculative nor limited to continued negotiations. Believing the settlement had been approved in principle, the District undertook concrete and outward-facing actions consistent with the settlement framework. It voted publicly to implement livestreaming and archiving of Board meetings, formally rescinded the cease-and-desist letters at issue in the litigation, expended funds and commenced construction of a designated

---

along" and that "the issue had been resolved satisfactorily for purposes of the settlement agreement"); *see also* Jan. 15, 2026 Tr. at 9:24–10:10, ECF No. 74 (S. Jamison testimony about District agreeing to make gathering area handicap accessible).

[90] Ex. I to Shore Decl. at 2, ECF No. 39-1 at 44.

[91] *See* Ex. K to Shore Decl. at 1, ECF No. 39-1 at 59 (May 1, 2025 email from S. Rose to B. Shore indicating Plaintiffs would agree to joint press release or each side issuing their own press release); Ex. M to Shore Decl. at 19, ECF No. 39-1 at 86 (May 5, 2025 email from S. Rose to B. Shore indicating Ms. Kratz was willing to voluntarily dismiss her claims prior to settlement agreement being finalized); Ex. M to Shore Decl. at 16, ECF No. 39-1 at 83 (May 13, 2025 email from S. Rose to B. Shore indicating Plaintiffs would seek increased attorneys' fees and costs as a result of developments in the case, including the District filing an answer to the complaint).

protest/gathering area adjacent to the administration building, and authorized payment of Plaintiffs' attorneys' fees.[92] These actions required formal approvals, public implementation, and expenditure of funds, and they altered the District's position in ways that cannot be undone without consequence.

Courts applying Pennsylvania law have repeatedly distinguished such reliance from mere participation in negotiations. In *I.K.*, for example, the court found reliance where a school district refrained from initiating truancy proceedings because it believed the dispute had been settled, emphasizing that the reliance involved legally significant forbearance rather than ordinary litigation conduct. 961 F. Supp. 2d at 700–01. The District's actions here—policy changes, rescission of enforcement measures, construction expenditures, and fee authorization—are similarly "definite and substantial" and satisfy the reliance element of promissory estoppel. *Id.* at 694.

### 3.  Injustice Can Be Avoided Only by Enforcement.

The final inquiry is whether injustice can be avoided only by enforcing the promise. *Crouse*, 745 A.2d at 610. This element requires the Court to assess the reasonableness of the reliance, the extent of the detriment, and whether denying enforcement would permit a party to benefit from the other's reliance while disavowing its own representations. *I.K.*, 961 F. Supp. 2d at 694, 695–96, 702.

---

[92] Ex. E to Nelson Decl., ECF No. 39-3 at 32 (Feb. 27, 2025 Board meeting minutes showing approval of livestreaming policy); Ex. D to Shore Decl., ECF No. 39-1 at 22–24 (letters to Plaintiffs rescinding cease and desist letters); Gallagher Decl. ¶¶ 13–16, 18–20, ECF No. 39-2 (Superintendent authorized construction of "community gathering area" in March 2025, the District spent $8,200 on construction thus far, and the District agreed to make the area handicap accessible but halted construction until settlement is finalized); Nelson Decl. ¶ 20, ECF No. 39-3 (Board authorized District's counsel to offer $63,000 in attorneys' fees and costs).

Here, the District's reliance was reasonable in light of the settlement conference, Plaintiffs' subsequent "signed off" representation, and the parties' continued progress toward implementation. Having induced the District to change policy, rescind enforcement actions, incur construction costs, and authorize payment of fees, Plaintiffs may not now repudiate their promises and proceed as though settlement implementation never occurred. Allowing such a result would leave the District having conferred substantial settlement benefits and incurred irreversible costs, while Plaintiffs would retain the ability to litigate unfettered. That outcome is precisely the inequity promissory estoppel is designed to prevent. *Id.* at 699, 702.

Plaintiffs argue that promissory estoppel is unavailable because the dispute can be resolved under traditional contract principles and because the School Code requires formal Board approval. The Court agrees that no enforceable contract was formed and that statutory requirements preclude contract enforcement. But that conclusion does not foreclose equitable relief. Pennsylvania courts, including in *I.K.*, have expressly enforced settlement promises through promissory estoppel where contract formation failed, emphasizing that equity may supply a remedy when rigid application of contract doctrines would produce injustice. *Id.* at 694–99. Promissory estoppel does not create a contract; it enforces a promise to the extent necessary to avoid unfairness caused by reliance.

### 4. Scope of Relief

The relief ordered here is appropriately tailored to the reliance established. Promissory estoppel permits equitable enforcement of the core promises that induced reliance, not the imposition of additional, unbargained-for terms. *Crouse*, 745 A.2d at 610. Accordingly, the Court enforces the settlement promises reflected in the District's reliance: continued livestreaming and archiving of Board meetings; rescission of the cease-and-desist letters; completion and maintenance of the designated protest/gathering area consistent with applicable law; and payment

of the attorneys' fees already authorized.[93] Upon completion of those obligations, Plaintiffs shall dismiss their claims with prejudice, in accordance with the accompanying Order. The Court retains jurisdiction to resolve any disputes necessary to effectuate this equitable relief.

## VI.    Attorneys' Fees

The District asks the Court to award its attorneys' fees and costs related to the filing of this motion because "Plaintiffs' attempt to abandon the settlement agreement between the Parties after nearly all of the material terms Plaintiffs requested had been satisfied, and their parallel attempts to incite the District to reject the settlement agreement were in bad faith and done vexatiously."[94] The Court disagrees and finds an award of attorneys' fees is not appropriate here.

"Attorneys' fees and costs are not ordinarily recoverable and unless specifically authorized by statute are awarded only in extraordinary cases." *Hobbs & Co. v. Am. Investors Mgmt., Inc.*, 576 F.2d 29, 35 n.18 (3d Cir. 1978). Attorneys' fees may, however, be awarded "when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* This is not an extraordinary case, and although the Court has concerns about Plaintiff Kratz's conduct that contributed to the derailment of negotiations, the fact that Plaintiffs raised a colorable argument as to the existence of the settlement agreement weighs against a finding that Plaintiffs acted vexatiously with respect to this motion.

The District relies on *Leonard v. University of Delaware* to support its contention that an award of attorneys' fees and costs are appropriate. In *Leonard*, the court enforced a settlement agreement, finding "no material facts concerning the existence, or terms, of the settlement

---

[93] The Court further enforces confidential promises as noted in the attached Order, which is filed under seal to protect the confidentiality of those terms.

[94] ECF No. 39 at 21.

agreement to be genuinely in dispute." 204 F. Supp. 2d 784, 789 (D. Del. 2002). There, the parties reached a final settlement agreement in a settlement conference before the court. *Id.* at 786. The plaintiff argued the settlement agreement was unenforceable but did not challenge the existence of the agreement between the parties. *Id.* at 787. The court found the plaintiff's behavior troubling for two reasons: first, the plaintiff was seeking to change the settlement terms in such a way that would allow him to later deny an agreement existed; and second, that the plaintiff could not be acting in good faith when he tried to deny the settlement agreement because he was not represented by the very same attorney who continued to represent him. *Id.* at 789–90.

Such bad faith or vexatious conduct is not at issue here. While it is true that Plaintiff Kratz's behavior online and through the filing of the criminal activity reports may have been the catalyst to the settlement's derailment, her conduct was not the only cause.[95] When the District expressed concerns about how her conduct had impacted the settlement, Ms. Kratz agreed to voluntarily dismiss her claims with prejudice and sign a release of her claims.[96] Plaintiffs continued to try to finalize the agreement until the District wrote the Court asking for additional terms.[97] Between May 1, 2025, and the filing of this motion, both parties asked for changes to the terms of the

---

[95] Jan. 9, 2026 Tr. at 94:9–18 (M. Kratz testimony) (stating she did not believe Facebook posts criticizing District's expenditure of funds on lawsuit would impact settlement), 100:13–20 (M. Kratz stating she did not believe emails to Board member would impact settlement and that "I thought as a community member I was able to share my feelings with my school board"), 121:20–122:1 (M. Kratz indicating she was not concerned continued Facebook posts would impact settlement "[b]ecause I didn't think my advocacy work had to stop. I thought the only thing I needed to do was not discuss the things we talked about in settlement"), ECF No. 73.

[96] Ex. M to Shore Decl. at 19, ECF No. 39-1 at 86 (May 5, 2025 email from S. Rose to B. Shore stating Ms. Kratz was willing to dismiss her claims with prejudice); Ex. M to Shore Decl. at 9, ECF No. 39-1 at 76 (May 21, 2025 email from S. Rose to B. Shore stating that Ms. Kratz would sign a release of claims in exchange for District agreeing to stipulate to dismissal of her claims).

[97] Ex. M to Shore Decl. at 19, ECF No. 39-1 at 86; Ex. M to Shore Decl. at 15, ECF No. 39-1 at 82 (May 13, 2025 email from B. Shore to S. Rose stating the District would not agree to Ms. Kratz stipulating to dismissal of her claims with prejudice); Ex. 5 to Pls.' Opp. at 7, ECF No. 53-5 at 8 (May 12, 2025 letter from B. Shore to the Court asking for additional settlement term prohibiting Plaintiffs from bringing private criminal complaint against the District); Ex. 3 to Pls.' Opp., ECF No. 53-3.

agreement and communicated in a manner that was not conducive to resolving this case.[98] Furthermore, because the Court finds no enforceable contract was formed, it cannot find that Plaintiffs' decision to walk away from the agreement that they believed did not exist was in bad faith. Therefore, the Court will deny the District's request for attorneys' fees.

The Court notes, however, that a lack of bad faith on Plaintiffs' part does not negate that equitable principles support enforcement of the agreement by promissory estoppel. Estoppel turns on principles of reasonable reliance and avoiding injustice, whereas a fee award is a sanction for culpable bad faith. *Compare Dugan v. O'Hara*, 125 F. Supp. 3d 527, 539 (E.D. Pa. 2015) (quoting *I.K. ex rel. B.K. v. Haverford Sch. Dist.*, 678 F. App'x 135, 137 (3d Cir. 2014)) ("Promissory estoppel is an equitable doctrine that may be invoked to enforce a promise made by one party to another when there is no enforceable agreement between those parties."), *with Leonard*, 204 F. Supp. 2d at 789 (explaining district court has power to assess attorneys' fees only in extraordinary cases where losing party willfully disobeyed a court order, or "acted in bad faith, vexatiously, wantonly, or for oppressive reasons"). While the Court finds it would be unjust to allow Plaintiffs to walk away from their agreement after the District has substantially fulfilled its obligations in reliance on Plaintiffs' promises, the Court does not find Plaintiffs so culpable as to require them to pay the District's fees and costs related to this motion.

---

[98] *See, e.g.*, Ex. M to Shore Decl. at 15, ECF No. 39-1 at 82 (Defense counsel characterizing Ms. Kratz's filing of criminal report as "akin to dropping a bomb onto the settlement"); Ex. C to Nelson Decl., ECF No. 39-3 at 18 (Email from M. Kratz to Board members addressing District "squandering" money on lawsuit); Ex. F to Nelson Decl., ECF No. 39-3 at 38 (Email from M. Kratz to Board members); Ex. H to Nelson Decl., ECF No. 39-3 at 49 (Email from M. Kratz to Board members); Ex. 3 to Pls.' Opp., ECF No. 53-3 at 4 (May 13, 2025 letter from S. Rose to the Court acknowledging M. Kratz's criminal reports, although constitutionally protected, "may not have been helpful to achieving a settlement of this case"); May 27, 2025 Status Tr. at 2:1–16 (S. Rose indicating Plaintiffs were no longer willing to fulfill one agreed upon term as part of settlement agreement).

## VII.  Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion to strike and grants the District's motion to enforce. The Court shall enforce the terms of the settlement agreement through promissory estoppel, as set forth in the Order that follows.